IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
November 4, 2013 Session

# HEATHER WIDNER, ADMINISTRATRIX OF THE ESTATE OF GLENN EDWARD SMITH v. CHATTANOOGA ENTERTAINMENT, INC. d/b/a ELECTRIC COWBOY, ET AL.

**Appeal from the Circuit Court for Washington County**
**No. 30002      Jean A. Stanley, Judge**

---

**No. E2013-00192-COA-R3-CV-FILED-FEBRUARY 11, 2014**

---

Heather Widner, Administratrix of the Estate of Glenn Edward Smith ("Plaintiff") sued Chattanooga Entertainment, Inc. d/b/a Electric Cowboy ("Electric Cowboy") and Ashley Langworthy with regard to the tragic death of Glenn Edward Smith ("Deceased"). Electric Cowboy filed a motion for summary judgment. After a hearing, the Trial Court granted Electric Cowboy summary judgment finding and holding, *inter alia*, that on the relevant night there had been no sale of alcoholic beverages pursuant to Tenn. Code Ann. § 57-10-102 by Electric Cowboy to Ashley Langworthy. Plaintiff appeals to this Court raising issues regarding whether the Trial Court erred in granting Electric Cowboy summary judgment and whether the Trial Court erred in refusing to allow Plaintiff additional time for discovery. We find and hold, as did the Trial Court, that no sale of alcoholic beverages by Electric Cowboy to Ashley Langworthy occurred on the relevant night, and that the Trial Court did not abuse its discretion in refusing to allow further discovery. We, therefore, affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the Court, in which CHARLES D. SUSANO, JR., P.J., and THOMAS R. FRIERSON, II, J., joined.

Michael E. Large, Bristol, Tennessee, for the appellant, Heather Widner, Administratrix of the Estate of Glenn Edward Smith.

Terrill L. Adkins, Knoxville, Tennessee, for the appellee, Chattanooga Entertainment, Inc. d/b/a Electric Cowboy.

# OPINION

## Background

In the early morning hours of March 20, 2011, 71 year old Deceased was killed when a vehicle driven by Ashley Langworthy crashed into Deceased's home. Ms. Langworthy was intoxicated at the time of the crash, and had consumed alcohol earlier that evening at Electric Cowboy. Plaintiff sued Ms. Langworthy and Electric Cowboy. Plaintiff settled her claims against Ms. Langworthy, and the Trial Court entered an order of dismissal of Plaintiff's claims against Ms. Langworthy with prejudice on October 11, 2012. Ms. Langworthy is not involved in this appeal.

Electric Cowboy filed a motion for summary judgment supported by, among other things, the affidavit of Ms. Langworthy, the affidavit of Emily Isaacs, and the testimony of Ms. Langworthy and Officer David Smith taken during Ms. Langworthy's criminal trial. In her affidavit, Ms. Langworthy states, in pertinent part:

> 2. On March 19, 2011, I drove to Chili's Restaurant in Johnson City, Tennessee where I ate dinner and drank two margaritas. I then drove from Chili's to a liquor store. However, I did not purchase anything at the liquor store. I then went into a Kroger's grocery store in Johnson City, Tennessee and I purchased a container of wine coolers called "Smirnoff Ice Coolers". I then drove to the parking lot of a strip shopping center where the Electric Cowboy nightclub is located.
>
> 3. I waited in the parking lot with a friend of mine for three other friends to travel from Greeneville, Tennessee to meet us at the Electric Cowboy. While I sat in the parking lot with my friend, I drank two of the Smirnoff Ice Coolers.
>
> 4. I then learned by a text message that the three people that we were waiting for to meet us at the Electric Cowboy had already arrived and were inside the Electric Cowboy.
>
> 5. When my friend and I walked into the Electric Cowboy we found our three friends standing at a private table to the left of the bar. When my friend and I arrived at the private table one of the men in the group of three friends who had already arrived purchased a round of tequila shots for each of us to drink. I did not order the tequila shot and I did not pay for the tequila shot. I then drank the tequila shot.

6. My friend and I socialized with the three other friends who met us at the Electric Cowboy. At that time, one of the men went to the bar and ordered another round of tequila shots. That friend also paid for the shots at the bar. I did not ask for, I did not order and I did not pay for the second round of tequila shots. When he returned to the private table with a second round of tequila shots, I drank one of the shots.

7. My friends and I danced and socialized for awhile after the second round of shots. At some point, a man I did not know went to the bar and ordered a third shot of tequila. That man also paid for the shot at the bar. I did not ask for, I did not order and I did not pay for the third round of tequila shots. When he returned to the private table where I was, I drank the shot of tequila.

8. We stayed at the Electric Cowboy for a period of time and then my friend and the three other friends that we had met at the Electric Cowboy left. We left before closing time.

9. My friends and I decided to go to Perkins Restaurant. We each drove our respective vehicles from the Electric Cowboy north on Roan Street to Perkins Restaurant. The three male friends that had met us at the Electric Cowboy followed me in their vehicle.

10. My friends and I decided to go to Perkins Restaurant. We each drove our respective vehicles from the Electric Cowboy north on Roan Street to Perkins Restaurant. The three male friends that had met us at the Electric Cowboy followed me in their vehicle. [sic]

11. When we all arrived at the Perkins Restaurant on Roan Street we parked in the parking lot. After some discussion in the parking lot, the three male friends decided they needed to go ahead and drive back to Greeneville, Tennessee. While my friend was talking to the male friends, I decided to leave. I have no memory other than backing out of the parking space as to what happened after that moment in time.

12. Although I ordered and consumed the two margaritas at Chili's Restaurant, and I selected, purchased and consumed the two Smirnoff Ice Coolers, I did not place any alcohol order at the Electric Cowboy, nor was the alcohol that I consumed at the Electric Cowboy delivered directly to me by anyone employed at the Electric Cowboy.

-3-

In her affidavit, Ms. Isaacs states that she is the friend who accompanied Ms. Langworthy on the night in question to Chili's Restaurant, to a liquor store, to Kroger's grocery store, to Electric Cowboy, and to Perkins Restaurant. Ms. Isaacs's affidavit confirms the details provided in Ms. Langworthy's affidavit and adds the following pertinent information:

2. On March 20, 2011[1], I drove to Chili's Restaurant in Johnson City, Tennessee where I met Ashley Langworthy for dinner. We both drank two margaritas. We purchased the first round, but some gentlemen from the bar purchased our second round. We then drove separately from Chili's to a liquor store. I believe that I purchased a few miniature bottles of liquor from this store, but I have no memory of Ms. Langworthy purchasing liquor at this location. We then drove separately to Kroger's grocery store in Johnson City, Tennessee and we each purchased a container of six wine coolers called "Smirnoff Ice Coolers". We then drove separately to the parking lot of a strip shopping center where the Electric Cowboy nightclub is located.

3. We waited in the parking lot in Ms. Langworthy's vehicle for three other friends to travel from Greeneville, Tennessee to meet us at the Electric Cowboy. While we sat in the parking lot waiting on the rest of our group, we each drank two of the Smirnoff Ice Coolers from our respective six-packs.

* * *

5. When Ms. Langworthy and I walked into the Electric Cowboy we found our three friends standing at a private table to the left of the bar. Shortly after our arrival, one of the men in the group of three friends who had already arrived had purchased a round of tequila shots for each of us to drink. Ms. Langworthy did not order the tequila shot, she did not pay for the tequila shot, and no employee of the Electric Cowboy delivered the shot of tequila to her. The entire group then drank the tequila shots.

6. Ms. Langworthy and I socialized with the three other men who met us at the Electric Cowboy for approximately one hour. At that time, one of the men went to the bar and ordered another round of tequila shots. That friend also

---

[1]As best as we can tell from the record on appeal, Ms. Isaacs and Ms. Langworthy met at Chili's on March 19, 2011 and socialized at the locations described in their affidavits through the evening and into the early morning hours of March 20, 2011. The date of March 20, 2011 contained in paragraph two of Ms. Isaacs's affidavit appears to be a typographical error.

ordered, paid for and received the shots at the bar. Ms. Langworthy did not order the second tequila shot, she did not pay for the second tequila shot, and no employee of the Electric Cowboy delivered the shot to her. The friend who purchased the second round of shots brought them back to the group's table. The entire group then drank the tequila shots.

7. Ms. Langworthy and I then socialized with the three other men who met us at the Electric Cowboy for approximately one hour. At that time, one of the men went to the bar and ordered another round of tequila shots. That friend also ordered, paid for and received the third round of shots at the bar. He then brought the third round of shots back to our table. Ms. Langworthy did not order the third tequila shot, she did not pay for the third tequila shot, and no employee of the Electric Cowboy delivered the third shot to her. The entire group then drank the tequila shots.

8. My friends and I then went to the dance floor and danced for some period of time. At that point, another male that I did not know began dancing with Ms. Langworthy. After dancing for a while we went back to the private table and the male that had joined us on the dance floor followed us to the table. After we talked for a while he then went to the bar by himself and ordered a mixed drink for Ms. Langworthy. This man ordered, paid for and received the drink at the bar. Ms. Langworthy did not order the drink, she did not pay for the drink, and no employee of the Electric Cowboy delivered the drink to her. Ms. Langworthy stayed at our table while this gentleman got her drink. I observed Ms. Langworthy consume some of this drink, but I believe that it was at least half full when we left shortly thereafter.

9. We stayed at the Electric Cowboy for a period of time and then our group of five decided to leave. We left before closing time.

10. Throughout the course of the evening I had the opportunity to observe Ms. Langworthy's behavior. She did not appear intoxicated at any point while we were at the Electric Cowboy. Additionally, I made it a point to watch her walking to her vehicle. She did not weave or stumble in any manner as she approached her vehicle.

11. Ms. Langworthy drove her vehicle from the Electric Cowboy north on Roan Street to Perkins Restaurant. I drove my vehicle following her to the Perkins Restaurant. The three male friends that had met us at the Electric Cowboy followed me in their vehicle, with Mr. Burks driving.

12. When we all arrived at the Perkins Restaurant on Roan Street we parked in the parking lot side-by-side with our windows rolled down for conversation. After some discussion in the parking lot, the three male friends decided they needed to go ahead and drive back to Greeneville, Tennessee. At some point we observed Ms. Langworthy suddenly back her vehicle out of the parking lot and leave. I have no knowledge of why she decided to leave at that time.

13. I was with Ms. Langworthy for the entire evening before the accident until she left Perkin's parking lot. Ms. Langworthy did not place any alcohol order at the Electric Cowboy, nor was the alcohol that she consumed at the Electric Cowboy delivered directly to her by anyone employed at the Electric Cowboy. I am sure that she did not purchase anything while at the Electric Cowboy because she and I both left our wallets and money in our vehicles before entering the club.

Ms. Langworthy incurred criminal charges arising out of the accident that caused Deceased's death. Officer David Smith testified during Ms. Langworthy's criminal trial that he was called to the scene of the accident around 3:20 a.m. Officer Smith arrived at the scene within five to ten minutes of receiving the call. Ms. Langworthy's vehicle had been driven into Deceased's apartment, and Deceased was pinned underneath the vehicle when Officer Smith arrived on the scene. Ms. Langworthy had to be extricated from her vehicle. Officer Smith testified that Ms. Langworthy's blood was drawn at the hospital and showed that her BAC was .18. Based upon skid marks at the scene, Officer Smith determined that just prior to the crash Ms. Langworthy was traveling in the range of 83 to 94 miles per hour. He stated that Ms. Langworthy's vehicle "left approximately about 185 feet of skid marks, so the vehicle was at 100 percent braking." Officer Smith explained that Ms. Langworthy had struck a tree, gone airborne, and crashed into a corner of the brick apartment building landing inside the apartment. Deceased was 71 years old at the time of his death and had raised six children.

Ms. Langworthy testified during her criminal trial that she was a twenty-five year old college graduate. Ms. Langworthy testified that on the night in question, she drank two margaritas, two Smirnoff Ice Coolers, and three shots of tequila. She testified that she did not pay for the tequila shots. She stated: "That was the friends we had met there who bought them for everybody." Ms. Langworthy testified that she and her friend ate dinner at Chili's between 10:00 and 11:00 p.m. and left Electric Cowboy before it closed, around 2:30 or 2:45 a.m. Ms. Langworthy testified that she does not remember leaving Perkins and stated that her next memory is:

waking up in my truck with bricks, and everything after that is very in and out. I don't have, it's very patchy. I don't remember being in the hospital. I don't remember being pulled out of my truck. I don't remember being taken to jail. I didn't even know what had happened.

The Trial Court held a hearing on Electric Cowboy's motion for summary judgment, and then entered an order on December 19, 2012, which stated, in pertinent part:

It appearing to this Court that the plaintiff did not file a response to the defendant's Motion for Summary Judgment in compliance with Rule 56 of the *Tennessee Rules of Civil Procedure*, but it appearing to this Court that the plaintiff filed a Motion to Quash a Notice of Hearing concerning the Motion for Summary Judgment indicating that the plaintiff wished to conduct further discovery in the case, but did not state with adequate or reasonable specificity what discovery was needed in order to respond to the defendant's Motion for Summary Judgment and further considering that the liability alleged against Chattanooga Entertainment, Inc. d/b/a Electric Cowboy is limited to all [sic] alleged violation of the Tennessee Dram Shop Act, and considering the statements of counsel, it is hereby

**ORDERED, ADJUDGED and DECREED** that the plaintiff shall file a response complying with the provisions of Rule 56 of the *Tennessee Rules of Civil Procedure* defining with particularity the discovery needed in order to determine where the plaintiff can establish a genuine issue of material fact in response to this defendant's Motion for Summary Judgment on or before December 17, 2012.

On December 18, 2012 Plaintiff filed a response to the motion for summary judgment and a motion seeking additional time to depose Ms. Langworthy and a representative of Top Shelf. In this motion, Plaintiff stated:

2. That since the date of the aforesaid hearing, attorney for Plaintiff has interviewed former Defendant, Ashley Langworthy, at Ms. Langworthy's present location, the Johnson City, Tennessee jail. During this interview Ms. Langworthy gave details of her state of intoxication and her blacking out while at Electric Cowboy on the evening in question. She also spoke of her belief that she exhibited intoxication while at Electric Cowboy on the evening in question, as well information [sic] that at least nine shots of tequila were

purchased by a male companion (the first sale being five shots and the second sale being four shots) and how this sale took place at the bar, just a few feet from where she sat.

3. That Ms. Langworthy further provided information that she had never drunk as much alcohol in her whole life as she did on the evening in question and was concerned about how she walked and acted while in the Defendant's establishment.

The Trial Court held another hearing on Electric Cowboy's Motion for Summary Judgment and on Plaintiff's motion to permit further discovery, and entered its order on December 21, 2012 finding and holding, *inter alia*:

Defendant's previously filed Statement of Undisputed Material Facts included the following:

1. Ashley Langworthy did not order an alcoholic beverages from the wait staff at the defendant bar.

2. The wait staff did not directly serve alcoholic beverages to Ashley Langworthy.

3. Ashley Langworthy did consume alcoholic beverages on defendant's premises.

4. Ashley Langworthy did not pay for any of those alcoholic beverages.

The issue before the Court is whether, under T.C.A. § 57-10-102, defendant "sold" alcoholic beverages to Ashley Langworthy. Both parties have cited the Court to the case of *Temlock v. McGinnis* 2006 Tenn. App. Lexus [sic] 481, July 20, 2006. This appears to be the most recent and definitive case on the issue before the Court. The *Temlock* court found that monetary payment alone is not dispositive of whether a sale took place. The Court indicated that "all relevant circumstances must be considered." Thus, this Court's inquiry to the plaintiff was whether discovery would reveal any such relevant circumstances.

In its December 18, 2012 response, there is no indication that the discovery requested by the plaintiff would alter the fact that Ms. Langworthy did not order from the wait staff, was not served by the wait staff, and did not

pay for the beverages consumed by her. The requested deposition of a trainer from Top Shelf would appear to have no bearing on any elements of whether a sale took place.

Upon the undisputed facts before the Court and there being no indication that further discovery would uncover relevant circumstances or material disputed facts for the Court to consider, this Court finds as a matter of law that a sale cannot be proven. Defendant's Motion for Summary Judgment is granted.

Plaintiff filed an appeal to this Court. A Statement of the Evidence was filed and approved by the Trial Court. The Statement of the Evidence provides, in pertinent part, that during the hearing on the motion for summary judgment and the motion to permit further discovery:

The trial court then questioned the plaintiff's counsel concerning the defendant's position. The plaintiff's counsel agreed that the facts contained in the Defendant's Statement of Undisputed Material Facts were, indeed, undisputed due to the fact that counsel for the plaintiff had met with Ashley Langworthy in her jail cell prior to the hearing on December 19, 2012. During that meeting, Ashley Landworthy [sic] confirmed to the plaintiff's counsel the accuracy of the facts contained in the Defendant's Statement of Undisputed Material Facts.

Although the plaintiff's counsel agreed that the facts were undisputed and agreed that *Timlock v. McGinnis*, 2006 Tenn. App. LEXIS 481, July 26, 2006, [sic] represented the case law applicable to the issue raised by the defendant's Motion for Summary Judgment, the plaintiff should be entitled to take the deposition of Ashley Langworthy and a representative from Top Shelf in order to create "new law" that if a patron comes to a bar and orders two or more drinks, pays for the drinks, and then disperses those drinks to other patrons, then the bar should be liable if a patron who receives a dispersed drink from another patron becomes intoxicated and is involved in a motor vehicle accident.

## Discussion

We restate the issues on appeal as: 1) whether the Trial Court erred in granting summary judgment to Electric Cowboy; and, 2) whether the Trial Court erred in refusing to allow Plaintiff to depose Ms. Langworthy and a representative of Top Shelf prior to ruling

on the motion for summary judgment. Electric Cowboy raises an issue regarding whether Plaintiff's motion to amend the complaint, which was never heard by the Trial Court, would have been futile.

We first consider whether the Trial Court erred in granting summary judgment to Electric Cowboy. With regard to summary judgments, this Court explained in *Estate of Boote v. Roberts*:

> The trial court's resolution of a motion for summary judgment is a conclusion of law, which we review *de novo* on appeal, according no deference to the trial court's decision. *Martin v. Norfolk S. Ry. Co.*, 271 S.W.3d 76, 84 (Tenn. 2008). Summary judgment is appropriate only when the moving party can demonstrate that there is no genuine issue of material fact, and that it is entitled to judgment as a matter of law. Tenn. R. Civ. P. 56.04; *see Hannan v. Alltel Publ'g Co.*, 270 S.W.3d 1, 5 (Tenn. 2008); *Byrd v. Hall*, 847 S.W.2d 208, 214 (Tenn. 1993).

> This action was filed [after July 1, 2011]. Therefore, the trial court was required to apply the summary-judgment standard set forth in Tennessee Code Annotated § 20-16-101.[2] That statute provides:

>> In motions for summary judgment in any civil action in Tennessee, the moving party who does not bear the burden of proof at trial shall prevail on its motion for summary judgment if it:

>>> (1) Submits affirmative evidence that negates an essential element of the nonmoving party's claim; or
>>> (2) Demonstrates to the court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim.

> Tenn. Code Ann. § 20-16-101 (Supp. 2012).[3]

---

[2]Section 20-16-101 is applicable to all cases filed on or after July 1, 2011.

[3]Section 20-16-101 was enacted to abrogate the summary-judgment standard set forth in *Hannan*,

(continued...)

*Estate of Boote v. Roberts*, No. M2012-00865- COA-R3-CV, 2013 Tenn. App. LEXIS 222, at **24-25 (Tenn. Ct. App. March 28, 2013), *no appl. perm. appeal filed* (footnotes in original but renumbered).

The issue of whether summary judgment was proper revolves around the question of whether, under Tenn. Code Ann. § 57-10-102, Electric Cowboy sold alcoholic beverages to Ms. Langworthy on the night of the accident.

Two statutes pertaining to alcohol-related injuries are relevant to this appeal, Tenn. Code Ann. § 57-10-101 and Tenn. Code Ann. § 57-10-102. Tenn. Code Ann. § 57-10-101 provides:

> **57-10-101. Proximate cause.**
>
> The general assembly hereby finds and declares that the consumption of any alcoholic beverage or beer rather than the furnishing of any alcoholic beverage or beer is the proximate cause of injuries inflicted upon another by an intoxicated person.

Tenn. Code Ann. § 57-10-101 (2013). In pertinent part, Tenn. Code Ann. § 57-10-102 provides:

> **57-10-102. Standard of proof.**
>
> Notwithstanding § 57-10-101, no judge or jury may pronounce a judgment awarding damages to or on behalf of any party who has suffered personal injury or death against any person who has sold any alcoholic beverage or beer, unless such jury of twelve (12) persons has first ascertained beyond a reasonable doubt that the sale by such person of the alcoholic beverage or beer was the proximate cause of the personal injury or death sustained and that such person:

\* \* \*

---

[3](...continued)
which permitted a trial court to grant summary judgment only if the moving party could either (1) affirmatively negate an essential element of the nonmoving party's claim or (2) show that the nonmoving party cannot prove an essential element of the claim at trial. *Hannan*, 270 S.W.3d at 5. The statute is intended "to return the summary judgment burden-shifting analytical framework to that which existed prior to *Hannan*, reinstating the 'put up or shut up' standard." *Coleman v. S. Tenn. Oil Inc.*, No. M2011-01329-COA-R3-CV, 2012 Tenn. App. LEXIS 453, 2012 WL 2628617, at *5 n.3 (Tenn. Ct. App. July 5, 2012).

(2) Sold the alcoholic beverage or beer to a visibly intoxicated person and such person caused the personal injury or death as the direct result of the consumption of the alcoholic beverage or beer so sold.

Tenn. Code Ann. § 57-10-102 (2013).

Our Supreme Court discussed Tenn. Code Ann. §§ 57-10-101 and 57-10-102 in *Biscan v. Brown*, 160 S.W.3d 462 (Tenn. 2005). The *Biscan* Opinion stated:

The effect of [Tenn. Code Ann. § 57-10-101] is to make it impossible for one who has been injured by an intoxicated person to state a claim for negligence against the person or entity who furnished the alcoholic beverage or beer because the statute removes, as a matter of law, the required element of legal causation. *See, e.g., Turner v. Jordan*, 957 S.W.2d 815, 818 (Tenn. 1997) (a claim for negligence requires a duty of care owed by the defendant to the plaintiff; a breach of that duty; an injury or loss; causation in fact; and legal, or proximate, causation.) In other words, there can be no cause of action resting on the allegation that one person "furnished" alcohol to another because it is impossible to prove proximate cause. The statute does not merely provide immunity from suit where one has furnished alcohol to another; rather, the statute constitutes the legislative determination that persons who furnish alcohol are not at fault for injuries inflicted by an intoxicated person.

The second part of the statute carves out an exception to the first part. It provides that a seller of alcohol may be liable to a third party for injuries if the seller sold alcohol to a minor or if the seller sold alcohol to an obviously intoxicated person and the sale was a proximate cause of the injuries suffered by the third party:

* * *

The clear language of the statute admits of only one conclusion: that the legislature intended to shield persons . . . who "furnish" alcohol in a social setting.

* * *

Moreover, as the Court of Appeals discussed, the legislative history of sections 101 and 102 reveals that the statute was intended to codify the common-law rule that an individual who furnishes alcohol to another is not liable for any damages resulting from the other's intoxication, even if those damages are foreseeable. *See, e.g., Cecil*, 575 S.W.2d at 271. Thus, although the legislative history reflects much debate and concern over the extent to which sellers of alcoholic beverages and beers should be covered, the starting point was that the mere furnishing of alcohol, whether gratuitously or for commercial gain, is not a basis for liability. *See Worley v. Weigels*, 919 S.W.2d at 593-94.

*Biscan*, 160 S.W.3d at 472-73 (footnote omitted).

In *Temlock v. McGinnis*, this Court interpreted and applied Tenn. Code Ann. §§ 57-10-101 and 57-10-102, and stated that "all relevant circumstances must be considered," when making a determination regarding whether a sale of alcoholic beverages had occurred. *Temlock v. McGinnis*, E2005-02646-COA-R3-CV, 2006 Tenn. App. LEXIS 481, at *13 (Tenn. Ct. App. July 20, 2006). In *Temlock*, we held that

when a customer enters an establishment that sells alcoholic beverages such as beer, places his own alcohol order, has the alcohol he ordered delivered directly to him by the seller with the seller's expectation of payment in return, and the customer who ordered the alcohol consumes that alcohol on the seller's premises, there is a sale to that customer under Tenn. Code Ann. § 57-10-102.

*Id*. at **14-15. In *Temlock* we held that a sale of alcoholic beverages did occur because Mr. McGinnis ordered the beer he consumed from Barley's wait staff, Barley's wait staff delivered the beer directly to Mr. McGinnis with the expectation of payment in return, and Mr. McGinnis consumed the beer on Barley's premises. *Id*. at *14.

The facts in the case now before us are distinguishable from the facts in *Temlock*. Electric Cowboy filed a properly supported motion for summary judgment showing that there were no genuine disputed issues of material fact that Ms. Langworthy did not order any alcoholic beverages from the wait staff at Electric Cowboy, that Ms. Langworthy was not served any alcoholic beverages by any wait staff at Electric Cowboy, and that Ms. Langworthy did not pay for any alcoholic beverages at Electric Cowboy. Given all of the relevant undisputed circumstances in this case, the fact that Ms. Langworthy consumed alcoholic beverages while at Electric Cowboy is insufficient by itself to show that

-13-

a sale of alcoholic beverages by Electric Cowboy to Ms. Langworthy occurred on the night of the accident.

As found by the Trial Court, there are no genuine disputed issues of material fact and Electric Cowboy was entitled to judgment as a matter of law as there was no sale of alcoholic beverages by Electric Cowboy to Ms. Langworthy. As such, we find no error in the Trial Court's grant of summary judgment to Electric Cowboy.

We next consider whether the Trial Court erred in refusing to allow Plaintiff to depose Ms. Langworthy and a representative of Top Shelf before ruling on the motion for summary judgment. We review a trial court's decisions regarding discovery under an abuse of discretion standard. *Eg., Frye v. St. Thomas Health Servs.*, 227 S.W.3d 595, 600 (Tenn. Ct. App. 2007). "A court abuses its discretion when it causes an injustice to the party challenging the decision by (1) applying an incorrect legal standard, (2) reaching an illogical or unreasonable decision, or (3) basing its decision on a clearly erroneous assessment of the evidence." *Lee Medical, Inc. v. Beecher*, 312 S.W.3d 515, 524 (Tenn. 2010).

As best as we can tell from the record on appeal, Top Shelf is involved in training bar tenders or wait staff who serve alcohol. What is clear from the record on appeal is that no representative of Top Shelf would have personal knowledge of the events that occurred during the time Ms. Langworthy spent at Electric Cowboy on the night in question. As such, the representative of Top Shelf would have no relevant evidence regarding whether or not a sale of alcoholic beverages by Electric Cowboy to Ms. Langworthy occurred on that night. Given that the dispositive issue was whether such a sale occurred, and the representative of Top Shelf would have no relevant evidence to offer on this subject, we cannot say that the Trial Court erred in refusing to allow Plaintiff time to take the deposition of the representative of Top Shelf.

As for taking the deposition of Ms. Langworthy, Plaintiff argues in his brief on appeal:

Whether such a deposition would definitely set forth additional material facts to defeat the Defendant's Motion for Summary Judgment is not a certainty, however Plaintiff should have been given the opportunity to do so, at least within the realm of a reasonable scheduling order that would have allowed Plaintiff to obtain more sworn testimony about her state of intoxication and other particulars that evening while at Electric Cowboy. This would not prejudice the Defendant but instead allow Plaintiff to obtain a "play by play" presentation of how she became intoxicated at Defendant's

place of establishment and soon thereafter killed Plaintiff's father, Glenn Edward Smith.

Again, we point out that the dispositive issue is whether a sale of alcoholic beverages from Electric Cowboy to Ms. Langworthy pursuant to Tenn. Code Ann. § 57-10-102 occurred on the night in question. Our General Assembly has made the public policy decision as to when a seller of alcoholic beverages may be liable for such a sale. It is not the role of the courts to modify the General Assembly's public policy decision by creating "new law" as is sought by the Plaintiff. The dispositive issue is not how Ms. Langworthy became intoxicated. Furthermore, the affidavits of Ms. Langworthy and Ms. Isaacs together with the testimony given by Ms. Langworthy in her criminal trial clearly show that Ms. Langworthy did not order any alcoholic beverages from the wait staff at Electric Cowboy, that the wait staff at Electric Cowboy delivered no alcoholic beverages to Ms. Langworthy, and that Ms. Langworthy did not pay for any alcoholic beverages at Electric Cowboy on the night in question. While the evidence produced by Electric Cowboy does give a play-by-play account of how Ms. Langworthy became intoxicated on the night in question, how Ms. Langworthy became intoxicated is not the dispositive issue. Furthermore, Plaintiff interviewed Ms. Langworthy in jail and this interview confirmed the accuracy of the undisputed material facts. We fail to see, as did the Trial Court, how deposing Ms. Langworthy would have garnered any more relevant information. The undisputed evidence clearly showed that a sale of alcoholic beverages from Electric Cowboy to Ms. Langworthy did not occur on the night in question. Given all this, we find no abuse of discretion in the Trial Court's refusal to allow Plaintiff additional time to take the deposition of Ms. Langworthy.

Finally, we turn to Electric Cowboy's issue regarding whether Plaintiff's motion to amend the complaint, which was never heard by the Trial Court, would have been futile. Our disposition of Plaintiff's issues renders this issue moot.

We find no error by the Trial Court. We, therefore, affirm the Trial Court's December 21, 2012 order granting summary judgment to Electric Cowboy.

## Conclusion

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the appellant, Heather Widner, Administratrix of the Estate of Glenn Edward Smith, and her surety.

_____
D. MICHAEL SWINEY, JUDGE

-15-